Michael C. NICHOLS, Plaintiff,

v.

KANSAS CITY POWER & LIGHT COMPANY, Defendant.

Harold R. RICKETTS, Plaintiff,

v.

KANSAS CITY POWER & LIGHT COMPANY, Defendant.

Denis M. CALLAGHAN, Plaintiff,

v.

KANSAS CITY POWER & LIGHT COMPANY, Defendant.

Nos. 73CV521-W-2 to 73CV523-W-3.

United States District Court, W. D. Missouri, W. D.

Jan. 28, 1975.

Addendum March 24, 1975.

---

Bert C. Hurn, U. S. Atty., W. D. Mo., Mary A. Schneider, Asst. U. S. Atty., Kansas City, Mo., William J. Kilberg, Sol. of Labor, Washington, D. C., T. A. Housh, Jr., Regional Sol., Dept. of Labor, Donald McCoy, Atty., Dept. of Labor, Kansas City, Mo., for plaintiffs.

Donald W. Giffin, Spencer, Fane, Britt & Browne, Kansas City, Mo., for defendant.

## MEMORANDUM OPINION

COLLINSON, District Judge.

These three cases were consolidated for trial inasmuch as the claims of the three plaintiffs are identical except as to the exact monetary amounts to which each will be entitled if he prevails. Each plaintiff was an employee of the defendant and each was employed as an analyst in the defendant's accounting department, positions which were other than temporary, within the meaning of Section 9 of the Military Selective Service Act, as amended (50 U.S.C. App. § 459). Each plaintiff left the employ of defendant in order to perform military service and training, satisfactorily completed such service and training, made application for re-employment and was re-employed by the defendant, again as an analyst in defendant's accounting department.

Under the applicable collective bargaining agreement between the defendant and the local union, analysts in the accounting department were paid an hourly wage under a progression schedule, which specified the starting wage and increases thereto after the first six months, after the second six months and after the second and third years. With reference to this progression schedule, the bargaining agreement also provided as follows:

Section 5. Merit Increases

(a) The rates specified in the rate ranges herein referred to represent the normal amounts expected to be paid to employees showing ability, initiative and average application to the job, increases granted under such cir-

cumstances to become effective on the employee's anniversary date. Increases are not automatic. Unless the employee demonstrates the foregoing he need not be awarded the normal increases, but in any such case the employee and the Union will be fully advised (in writing, if requested) of the circumstances upon which the action was predicated and the status of such employee will be reviewed and reconsidered within six months thereafter. The provisions of this subsection are subject to the grievance procedure.

(b) All employees in job classifications carrying a rate range will normally be expected to complete the period of time prescribed for each step before becoming eligible for consideration for a rate increase.

Each plaintiff was re-employed, after his military service, at the same step in the progression schedule as when he left. It is the contention of the plaintiffs that they should have been re-employed at the wage rate in the progression schedule which they would have attained if they had remained in continuous employment during the time they were in the military service. The collective bargaining agreement further provides for sick leave privileges. The applicable provisions are as follows:

Section 2. Accumulation of Sick Leave Privileges

All employees covered by this Agreement shall accumulate sick leave privileges as follows:

(a) Employees will be credited with six working days' sick leave privileges at the conclusion of the first six months of their employment, and thereafter they shall be credited with additional sick leave privileges at the rate of one working day per month (the credit to be given on the last day of each month) up to a maximum of one hundred sixty working days.

(b) For the purpose of computing sick leave privileges persons employed between the first and fifteenth days of a month will be regarded as having worked the full month, and those employed the sixteenth and thereafter as not having worked at all during the month.

Section 7. Sick Leave Accumulated During an Illness

Sick leave privileges accumulated during a sick leave or compensable injury absence will be credited to the employee and will be available for that absence if the employee has available sick leave privileges at the beginning of the absence.

21. Article XII, section 1 provides as follows:

(a) For justifiable reasons, the Company may grant a personal leave of absence without pay to any employee upon being given reasonable notice and provided the conditions of work are such that his services can be spared. A maternity leave of absence will be granted upon proper notification to the Company beginning at the end of the six month of pregnancy and ending not later than two months following delivery.

(b) Company service and job seniority shall continue to accumulate during a leave of absence for a period not to exceed five months; but no other benefits or accrual of benefits will occur during a leave of absence.

(c) If an employee overstays a leave or if he accepts employment elsewhere during the leave without the written consent of the Company, he will be deemed to have resigned.

Plaintiffs' second contention is that they should have received credit for sick leave privileges for the period that they were in military service.

Plaintiffs rely on Section 9 of the Universal Military Training and Service Act, as amended (50 U.S.C. App. § 459), the applicable provisions of which provide as follows:

(b) In the case of any such person who, in order to perform such training and service, has left or leaves a position (other than a temporary posi-

tion) in the employ of any employer and who (1) receives such certificate [of satisfactory service], and (2) makes application for reemployment within ninety days after he is relieved from such training and service * * *

(B) if such position was in the employ of a private employer, such person shall—

(i) if still qualified to perform the duties of such position, be restored by such employer or his successor in interest to such position or to a position of like seniority, status, and pay * * *

(c)(1) Any person who is restored to a position in accordance with the provisions of paragraph (A) or (B) of subsection (b) shall be considered as having been on furlough or leave of absence during his period of training and service in the Armed Forces, shall be so restored without loss of seniority, shall be entitled to participate in insurance or other benefits offered by the employer pursuant to established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such person was inducted into such forces, and shall not be discharged from such position without cause within one year after such restoration.

(2) It is declared to be the sense of the Congress that any person who is restored to a position in accordance with the provisions of paragraph (A) or (B) of subsection (b) should be so restored in such manner as to give him such status in his employment as he would have enjoyed if he had continued in such employment continuously from the time of his entering the Armed Forces until the time of his restoration to such employment.

The history of this Act is interesting and significant. Section 9(c)(1) above was contained in the Selective Training and Service Act of 1940 (50 U.S.C.A. App. § 308) which expired on March 31, 1947, as Section 8(c). Section 9(c)(2) above did not appear in that Act. In 1946 the United States Supreme Court decided the case of Fishgold v. Sullivan Corporation, 328 U.S. 275, 66 S.Ct. 1105, 90 L.Ed. 1230, interpreting the Selective Training and Service Act of 1940, and held that the provision for restoration without loss of seniority and the further phrase "as having been on furlough or leave of absence" meant that a returning veteran did "not step back on the seniority escalator at the point he stepped off. He steps on at the precise point he would have occupied had he kept his position continuously during the war." The Selective Service Act of 1948 reenacted Section 8(c) of the 1940 Act as Section 9(c)(1), and added the provisions of 9(c)(2), thus enacting into the statute the exact broad interpretation of Section 9(c)(1) given by the Supreme Court in *Fishgold.*

In Oakley v. Louisville & N. R. Co., 338 U.S. 278, 70 S.Ct. 119, 94 L.Ed. 87 (1949), the Court reaffirmed the principles of *Fishgold*, referring to that case,

"We stated, in effect, that an honorably discharged veteran, covered by the statute, was entitled by the Act to be restored not to a position which would be the precise equivalent of that which he left when he joined the Armed Forces, but rather to a position which, on the moving escalator of terms and conditions affecting that particular employment, would be comparable to the position which he would have held if he had remained continuously in his civilian employment."

That decision was under the 1940 Act.

However, the conflict between the wording of Section 9(c)(1) which restored the returning veteran's benefits as if he had been "on furlough" or "on leave of absence" and the "continuous employment" test of Section 9(c)(2) continued to bother the courts. The Court of Appeals of the Third Circuit, in Diehl v. Lehigh Valley R. Co., 211 F. 2d 95 (1954), found the provisions "irreconcilable" and denied the plaintiff the position he would have attained in

continuous employment because he would not have been advanced if on furlough or leave of absence while in military service.

The Supreme Court reversed that holding in a per curiam opinion, 348 U. S. 960, 75 S.Ct. 521, 99 L.Ed. 749 (1955), simply citing *Oakley, supra,* thus establishing the continuous employment test.

The next case before the Court was McKinney v. Missouri–K.–T. R. Co., 357 U.S. 265, 78 S.Ct. 1222, 2 L.Ed.2d 1305 (1957). That case laid down the principle upon which the defendant bases his defense in this case. McKinney contended that by virtue of the seniority he had attained while in military service, he was entitled, under the bargaining agreement in effect, to a position that was filled during his absence in the service. The Court held that under the bargaining agreement the promotion to the advanced position was not dependent on automatic progression, but dependent on fitness and ability, and the exercise of a discriminating managerial choice. Therefore, the defendant was not entitled to the position as he would have been had it been an automatic promotion. However, in the concluding paragraph of that opinion the Court recognized that the plaintiff had not had an opportunity to prove that, regardless of the terms of the bargaining agreement, by custom and practice the plaintiff necessarily would have been assigned to that position had he remained in the employ of the company during his military service, and granted the plaintiff leave to amend his complaint to allege, if such be the fact, that in actual practice under the collective bargaining agreement the advancement was automatic.

In 1964 the Supreme Court reversed the Court of Appeals of this Circuit in the case of Tilton v. Missouri Pacific R. Co., 376 U.S. 169, 84 S.Ct. 595, 11 L.Ed. 2d 590. This was another seniority case and the Court of Appeals had determined that the *McKinney* case had overruled *Diehl.* The Court of Appeals interpreted *McKinney* to mean that for a

veteran to receive the benefit of the statute "the promotion in question (must) be automatic and . . . seemingly . . . automatic as a matter of foresight rather than of hindsight." That court further determined that the promotion in the case before it was subject to contingencies including continuing satisfactory work by petitioners in the up-graded position and that, since the promotion of the plaintiff could not have been foreseen with absolute certainty at the time he entered military service, he was not entitled to his seniority status in the promoted position as of the date he probably would have achieved it but for military service.

The Supreme Court held in *Tilton*:

"McKinney was not intended to and did not overrule Diehl. Nor did McKinney establish a requirement of absolute foreseeability. That case did not involve the Diehl type situation where advancement depends essentially upon continuing employment. It turned upon the fact that the collective bargaining agreement there in issue made the exercise of management discretion a prerequisite to promotion. The court concluded, therefore, that the advancement was not basically dependent upon continued employment. . . . Furthermore, the court's mandate in McKinney supports the view that the court did not adopt a rule of absolute foreseeability. In remanding the case, the Court granted McKinney the leave to amend his complaint to allege, if such was the fact, that in practice under the collective bargaining agreement 'advancement from group 1 to group 2 is automatic.' "

■ This sets the stage for the facts in this case. The defendant, of course, cites the wording of the contract to urge that the promotions in pay are not automatic but can be granted or withheld by management. However, under the teachings of *McKinney* and *Tilton*, the wording of the contract is not controlling if actual practice under the contract is shown to be different.

The evidence in this case shows that everyone employed as an analyst by the defendant started at the bottom of the progression scale, regardless of previous ability or experience. The evidence further disclosed that there was no grading, or rating of the employees' work by any supervisor, and no tests of any kind were given prior to promotion in accordance with the progression scale. No objective standards for withholding promotion were delineated. The promotion itself was accomplished by simply typing the increased pay rate on the employee's payroll records (from which his check was prepared) on the correct calendar date and having the change rate approved by being initialed by his superintendent. Out of all 49 people employed as analysts since 1964, all received increases on their anniversary dates but one. In that particular case the employee did not have the necessary educational qualifications to be employed but was employed on condition that she pursue further education. After the first two step increases were given her, the third step was withheld by management, on the grounds that the employee had shown a "continued lack of ability to carry out work of increasing importance and complexity," because of lack of schooling in certain fields.

The evidence further demonstrates that the plaintiffs in this case returned to their positions and did exactly the same work that the employees who had not been in the military were doing at the advanced hourly rates because of their continuous employment. There is no contention in this case that these plaintiffs are not fully satisfactory employees and no contention that, except for their absence in military service, they would not have received each step raise on the anniversary date.

The defendant argues that it is elementary that experience increases proficiency and that the company is paying for increased proficiency by the wage progression scale, but there was no solid evidence to demonstrate how many months or years it takes an analyst

doing this type of work to attain his maximum proficiency, or indeed that any group of fourth year employees or individual fourth year employees are more proficient in this work than second year employees. Neither is there any evidence that any employee has ever been advanced before the date authorized by the progression scale as an award for superior proficiency over other employees with the same seniority.

It is obvious from the foregoing that the facts in this case do not establish a clear situation of "automatic promotion." The promotion is automatic without the exercise of a managerial decision to allow it, but can be withheld by a decision that the employee's services are unsatisfactory.

Fortunately, there is considerable precedent by decisions of courts faced with similar "grey area" cases. In Brooks v. Mo. Pac. R. Co., 376 U.S. 182, 185, 84 S.Ct. 578, 580, 11 L.Ed.2d 599, the court said:

"We accept the conclusion of the District Court that but for petitioner's military service, he probably would have achieved, by virtue of continued satisfactory employment, seniority status as a journeyman mechanic in North Little Rock on November 3, 1955. It follows, therefore, that he is entitled to this status under the relevant statutes."

The key words in that statement are, of course, *"probably* would have achieved, by virtue of *continued satisfactory* employment."* The Court finds that in this case these plaintiffs probably would have achieved by virtue of continued satisfactory employment, the pay status they are seeking in this suit. This fact is not even denied by defendant.

In a case involving very similar facts, Power v. Northern Illinois Gas Company, 388 F.2d 427 (7th Cir. 1968), the court said:

"The record shows that the twenty men who were promoted to meter repairmen during Power's absence ad-

vanced 'in order of seniority.' Nothing in the record indicates that these men had greater ability than Power, nor that any tests were given them that Power could not have successfully met. We conclude that despite the wording of the bargaining agreement the finding that 'in actual practice' promotion was virtually automatic and was not the result of Northern's discretion is not clearly erroneous."

The Court finds under the undisputed facts in this case, that despite the terms of the bargaining agreement, in actual practice promotion was virtually automatic and was not the result of the exercise of managerial discretion.

Again, quoting from Hatton v. Tabard Press Corp., 406 F.2d 593 (2d Cir. 1969), this language is singularly appropriate to the facts in this case:

"However, it is apparent from this record that such employees glide from one pay rate into a higher because of years of service, so long as their work meets the minimum standard necessary to avoid discharge. Accordingly, we believe that, under the controlling authorities, the element of management discretion was too narrow to defeat plaintiff's suit."

⬛ This Court finds that under the facts of this case the element of management discretion is too narrow to defeat plaintiffs' claims.

The second issue in this case is whether plaintiffs are entitled to accrue sick leave privileges under the contract for the period they were in military service. Under the contract the employee was credited with six days' sick leave at the end of the first six months of employment and "additional sick leave privileges at the rate of one working day per month" to a maximum of one hundred sixty days.

Under another provision of the contract, sick leave privileges did not accrue during a leave of absence.

The precise legal point is whether the accumulation of sick leave is incidental to seniority to which the returning serv-ice-man is entitled under the "continuous employment" rule, or one of the "other benefits" under Section 9(c)(1) to which he is not entitled because employees do not receive it when on leave of absence.

As discussed, the courts have applied the "escalator" rule to the provision of the law that guarantees re-employment in a position of "like seniority, status, and pay." The precise question facing the courts in many different factual situations has been whether the precise benefit is a "perquisite of seniority" or an "other benefit" not affected by the escalator principle.

The leading case on this question is Accardi v. Pennsylvania Railroad, 383 U.S. 225, 86 S.Ct. 768, 15 L.Ed.2d 717 (1966). This case involved severance pay, and the defendant contended (as the defendant does in this case) that the qualification for severance pay was conditioned on actual work performed, that therefore it was deferred compensation for actual work performed, and not a "perquisite of seniority." The Court held that "seniority" should be given a liberal construction and that severance payments were "based primarily on the employee's length of service." The Court said, l.c. 230, 86 S.Ct. l.c. 772:

"The requirements of the 1940 Act are not satisfied by giving returning veterans seniority in some general abstract sense, and then denying them the perquisites and benefits that flow from it. We think it clear that the amount of these allowances is just as much a perquisite of seniority as the more traditional benefits such as work preference and order of lay-off and recall. We hold that the failure to credit petitioners' "compensated service" time with the period spent in the armed services does not accord petitioners the right to be reinstated 'without loss of seniority' guaranteed by §§ 8(b)(B) and (C)."

The Court of Appeals of this Circuit applied the teachings of *Accardi, supra,* in the case of Morton v. Gulf, Mobile and Ohio Railroad Co., 405 F.2d 415

(1969). In that case the plaintiff's accrued vacation pay depended upon the number of years of "continuous compensated service" (working time) served. The employer did not give credit for time spent in the armed services, on the exact argument made in this case: that it was not "working time." The Court disagreed, saying:

"Congress has painted veteran's reemployment benefits with a full brush and not with a narrow stylus. *Accardi*, in conjunction with the Supreme Court's order in *Eagar* [Magma Copper Co. v. Eagar, 9 Cir., 380 F.2d 318] impels a conclusion that the earlier cases relied on by appellant now lack weight on the issue before us."

The Court entered a judgment for accrued vacation pay adjusted by adding the time in service to his "compensated service credit."

An overall picture of the struggles with the courts on this question appears in 1974 Wash.U.L.Q. 296.

Under the teachings of *Accardi* and *Morton*, the length of time these plaintiffs spent in the armed forces must be counted as "time in employment" or "working time" under the facts of this case in computing sick leave benefits.

▮ This Court finds that accumulated sick leave benefits in this case were "perquisites of seniority" and not compensation for actual work performed, and therefore plaintiffs are entitled to the credits they seek.

The attorneys in this case assured the Court that, in the event the Court found for the plaintiffs, the attorneys could compute and agree upon the amount of the monetary judgment in each case. The attorneys are directed to meet within ten days from this date, and to file agreed forms of judgment in each case within fifteen days from this date.

### ADDENDUM TO OPINION FILED JANUARY 28, 1975

Since the filing of the Court's opinion in these cases, the Supreme Court has handed down its opinion in Foster v. Dravo Corporation, —— U.S. ——, 95 S. Ct. 879, 43 L.Ed.2d 44 (1975). Final judgment has not been entered in these cases, and the defendant has requested the Court to modify its previous opinion as to the accumulation of sick leave benefits. Defendant contends that the application of the teachings in the *Foster* case would cause a denial of these benefits.

The *Foster* case specifically does not overrule Accardi v. Pennsylvania R. Co., 383 U.S. 225, 86 S.Ct. 768, 15 L.Ed.2d 717 (1966), but distinguishes it on the facts. Frankly, this Court has some difficulty in following the distinction. In *Accardi* the Court held that a benefit not traditionally considered a seniority right, namely, a veteran's eligibility for a severance payment, was a perquisite of seniority, even though the contract of employment depended upon the length of the employee's "compensated service" with the respondent railroad. In *Accardi* the Court held that the severance payments were not intended as a form of deferred compensation for work done in the past, but rather as a means of compensating employees for the loss of rights and benefits accumulated over a long period of service, and that therefore the severance payments were "just as much a perquisite of seniority as the more traditional benefits such as work preference and order of lay-off and recall."

In *Foster* the benefit claimed was full vacation benefits. The contract required the employees "to work" a minimum of 25 weeks in the calendar year to qualify. The Court held that this "work requirement constitutes a bona fide effort to compensate for work actually performed" and, unlike the severance payments in *Accardi*, "were intended as a form of short-term compensation for work performed."

In the cases before this Court sick leave accrues as a result of continual "employment," not work performed. This interpretation is re-enforced by a further provision that sick leave accrues during a "sick leave or compensable in-

jury absence." This language completely negatives the theory that accrual of sick leave is "short-term compensation for work performed," the basis of the holding in *Foster*.

In addition, this Court feels that accrued sick leave benefits, being entirely contingent upon sickness, vary materially from vacation benefits which are allowable without contingency. But in view of the above reasons for denying defendant's motion, this distinction will not be further discussed.

For the foregoing reasons, the defendant's motion to modify the Court's previous opinion is denied.